United States District Court
Southern District of Texas

**ENTERED**

May 14, 2026

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| v. | § | Criminal No. 5:25-cr-00902 |
| | § | |
| ALEXIS GONZALEZ HERNANDEZ, | § | |
| AKA: ALEXANDER MONDRAGON | § | |
| HERNANDEZ, | § | |
| and GABRIEL SILVA | § | |

## REPORT AND RECOMMENDATION

Before the Court are Defendant Gonzalez Hernandez's Motion to Suppress, Dkt. No. 91, the Government's Response, Dkt. No. 95, and the parties' supplemental briefings, Dkt. Nos. 104, 105; and Defendant Silva's Motion to Suppress, Dkt. No. 111, the Government's response, Dkt. No. 117, and the parties' supplemental briefings, Dkt. Nos. 124, 125. These Motions were referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1). Dkt. Nos. 92, 112. For the following reasons, the undersigned respectfully **RECOMMENDS** that Defendant Gonzalez Hernandez's Motion to Suppress, Dkt. No. 91, be **DENIED IN PART** regarding the manual search of his cellphone and **GRANTED IN PART** regarding the forensic search of his cellphone. The undersigned further **RECOMMENDS** that Defendant Silva's Motion to Suppress, Dkt. No. 111, be **DENIED**.

### *Factual Background*

Defendants were arrested on May 19, 2025, due to their alleged orchestration of a unique purchase in the Buc-ee's parking lot in Luling, Texas. As it happened, more than delicious beaver

1

nuggets were to be exchanged. In fact, an undercover Homeland Security Investigations (HSI) Special Agent had been communicating with Jose "Bam" Cerrato, who was incarcerated in the Texas Department of Corrections, and the two reached an agreement for the purchase of several kilograms of cocaine. Apr. 1 Hr'g at 2:14–17; Dkt. No. 95 at 2; Dkt. No. 91 at 5. Cerrato and the undercover agent communicated primarily through WhatsApp, on which Cerrato's phone number is 832-961-5709 and his contact name is JAstro. Jan. 20 Hr'g at 10:12, 10:29; Def. Exs. 5–8, 11A; Dkt. No. 95 at 2; Dkt. No. 117 at 2. The undercover agent originally agreed with Cerrato that they would complete the purchase on May 13, 2025, but they rescheduled and agreed to conduct the exchange on May 19, 2025, in the Buc-ee's parking lot in Luling, Texas. Jan. 20 Hr'g at 10:13–15; Apr. 1 Hr'g at 2:14–17; Dkt. No. 91 at 5. Cerrato told the undercover agent that his brother-in-law, Pelon, would pay part of the purchase price and would be driving a Nissan Altima. Apr. 1 Hr'g at 2:16, 2:21; Dkt. No. 95 at 2–3. Agents ultimately identified Pelon as Defendant Silva. Apr. 1 Hr'g at 2:16.

On May 19, 2025, at approximately 7:25 p.m., Cerrato introduced Defendant Silva to the undercover agent on a conference call. Dkt. No. 95 at 3; Dkt. No. 117 at 3. About ten minutes later, Defendant Silva pulled into the Buc-ee's parking lot in a blue Nissan Altima and parked next to the undercover agent, and the two began speaking after exiting their vehicles. Jan. 20 Hr'g at 10:17; Apr. 1 Hr'g at 2:21–22; Dkt. No. 91 at 5; Dkt. No. 117 at 3. During their conversation, Defendant Silva was also speaking with Cerrato on his black iPhone 13. Jan. 20 Hr'g at 10:22–23; Apr. 1 Hr'g at 2:23; Silva Gov't Ex. 4; Dkt. No. 117 at 3. Shortly thereafter, Defendant Silva waved another vehicle over, and "Alexander Mondragon," later identified as Defendant Gonzalez Hernandez, drove up in a grey Mazda 6 and parked next to Defendant Silva and the undercover agent. Jan. 20 Hr'g at 10:23; Apr. 1 Hr'g at 2:27; Dkt. No. 95 at 3; Dkt. No. 91 at 5. When

Defendant Gonzalez Hernandez arrived, Defendant Silva drove over to the nearby gas pumps. Apr. 1 Hr'g at 2:27; Dkt. No. 117 at 4; *see also* Silva Def. Ex. 1. The undercover agent was beckoned into the back seat of Defendant Gonzalez Hernandez's car, where he began speaking with Defendant Gonzalez Hernandez, who handed the undercover agent a backpack containing United States currency.[1] Jan. 20 Hr'g at 10:24–25. The undercover agent asked Gonzalez Hernandez "who was going to see the work," and whether Defendant Gonzalez Hernandez "wanted him to bring it to cut it in." *Id.* at 10:26. When Defendant Gonzalez Hernandez spoke into his phone saying, "Pelon didn't see it?", the undercover agent gave the "takedown command" to initiate the arrest of both Defendants. *Id.*; Dkt. No. 95 at 3.

While Defendant Gonzalez Hernandez was arrested without incident in the Buc-ee's parking lot, Defendant Silva fled in his Nissan Altima, with agents in hot pursuit.[2] In fact, Defendant Silva led law enforcement on a high-speed chase at approximately 120 miles per hour for approximately thirty-five miles. Jan. 20 Hr'g at 10:27; Dkt. No. 95 at 4; Apr. 1 Hr'g at 2:33, 3:51–54. About twenty vehicles, many with lights and sirens activated, and one Customs and Border Patrol (CBP) helicopter joined the pursuit. Apr. 1 Hr'g at 3:51–53. Multiple tire deflation

---

[1] The exact amount of currency contained in the backpack is unclear from the filings. Defendant Gonzalez Hernandez states that the backpack contained $80,000, the agreed purchase price for the cocaine. Dkt. No. 91 at 5. The Government states that the "defendant told the undercover there were five (5) bundles of $5,000 and one (1) bundle of $25,000 inside the backpack," which would total $50,000. Dkt. No. 95 at 3. Accordingly, the undersigned deduces that the backpack contained approximately $50,000 in United States currency and possibly up to $80,000.

[2] Defendant Silva disputed this characterization, arguing that the unmarked DPS car rear-ended him, prompting him to leave Buc-ee's. Apr. 1 Hr'g at 3:19–22. The Court finds Defendant Silva's version of events unconvincing. On one hand, the Court cannot discern by the video evidence whether red and blue lights were visible on the unmarked law enforcement vehicle that first pursued Defendant Silva, despite Agent Silvia's testimony that there were flashing lights in the grill of the police car. Apr. 1 Hr'g at 4:17–18; *but see* Silva Def. Ex. 1 at 0:31–33. Regardless of whether red and blue lights were engaged, it is likely that Defendant Silva would not have seen them in the grill of the police vehicle as it made contact with the back of his car. Silva Def. Ex. 1 at 0:31–33. Nevertheless, Defendant Silva's disregard of prior attempts to stop him in his vehicle, his maintaining a speed of 110 or 120 miles per hour for nearly forty miles, and the requirement of multiple spike strips to bring the Nissan Altima to a halt lead the Court to conclude that referring to Defendant Silva's departure from Buc-ee's as a flight and pursuit is appropriate. Apr. 1 Hr'g at 3:11, 3:51–55; Silva Gov't Ex. 5.

3

devices were deployed, and Defendant Silva eventually drove off the road and came to a halt. Dkt. No. 95 at 4; Silva Gov't Ex. 5. When Defendant Silva exited his vehicle with his hands in the air, he was still holding his black Apple iPhone 13 in his right hand. Dkt. No. 117 at 4; Apr. 1 Hr'g at 3:58; Silva Gov't Ex. 5 at 7:20–30. Agent John Silvia testified that he seized the cellphone incident to Defendant Silva's arrest, and the phone appeared to be recording.[3] Apr. 1 Hr'g at 4:01–4:02; Silva Gov't Ex. 5 at 8:36–52.[4]

Agent Silvia put the Apple iPhone 13 in airplane mode and ultimately gave the cellphone to HSI Special Agent John Condon, the lead case agent. Silva Gov't Ex. 5 at 8:36–52; Apr. 1 Hr'g at 4:02–4:04. In turn, Agent Condon turned the cellphone over to Secret Service Digital Crimes Task Force Officer Rolando Perez, who assisted HSI with digital forensics for this investigation. Apr. 1 Hr'g at 2:34–36; Silva Gov't Ex. 2; Jan. 20 Hr'g at 1:48. Defendant Silva's cellphone was stored at the Texas Anti-Gang ("TAG") Unit in Laredo, Texas, awaiting a warrant for Officer Perez to conduct a forensic search. Apr. 1 Hr'g at 2:34–36.[5] Officer Perez maintained possession of Defendant Silva's cellphone throughout his subsequent detention in the Gonzalez County Jail, where he was held on related state charges. Apr. 1 Hr'g at 4:02–4:04; Silva Gov't Ex. 2; Dkt. No. 111 at 2; Dkt. No. 117 at 4–5. After being added to this case by superseding indictment on August 19, 2025, Defendant Silva was transferred from state to federal custody on September 8, 2025, and

---

[3] Agent Silvia currently works as an HSI Agent, but prior to his position with HSI, he was a Trooper for the Texas Department of Public Safety (DPS). In this investigation, he served as the DPS liaison, coordinating the DPS resources and personnel that facilitated Defendants' arrest. Apr. 1 Hr'g at 3:43–45.

[4] At the April 1 Suppression Hearing, Defense counsel argued in passing that Defendant Silva asked for his cellphone after he had been handcuffed. Apr. 1 Hr'g at 4:05–10. However, the undersigned finds that this contention is unsupported by the record. If Defendant Silva made a statement as he was detained, it is inaudible in the evidence currently available to the Court, *see* Silva Gov't Ex. 5, and Defendant did not present any additional evidence on this point.

[5] The TAG Unit is a joint state and federal law enforcement task force that investigates organized criminal activity. Apr. 1 Hr'g at 2:35. After seizing Defendant Silva's phone, Agent Condon stored it in evidence at the TAG Unit location in Laredo, Texas. *Id.*

remains in federal custody presently.  Dkt. No. 117 at 5, 14; *see also* Dkt. Nos. 47, 49, 57.  At no point has he requested the return of his cellphone.  Apr. 1 Hr'g at 2:39, 4:54; Dkt. No. 117 at 5.

Meanwhile, back in the Buc-ee's parking lot, agents detained Defendant Gonzalez Hernandez and could hear Defendant Silva's voice saying, "I knew the laws were there!" from Defendant Gonzalez Hernandez's phone.  Jan. 20 Hr'g at 10:27–29; Dkt. No. 95 at 3–4.  In fact, Agent Condon testified that he could see that both Defendants were on a three-way WhatsApp call with JAstro, the contact name for Jose Cerrato.  Jan. 20 Hr'g at 10:27–29.  Agent Condon noted that there were two cellphones in Defendant Gonzalez Hernandez's car (a Motorola Moto and a Samsung Galaxy), but only one phone was in use (the Moto phone).  Jan. 20 Hr'g at 10:31, 10:45.  Agent Condon seized both cellphones.  *Id.*  HSI Special Agents John Condon, David Abelar, and Luis Guerra proceeded to interrogate Defendant Gonzalez Hernandez in Spanish, sitting in a law enforcement vehicle.  Jan. 20 Hr'g at 10:39; Dkt. No. 91 at 6.  One of the agents advised Defendant Gonzalez Hernandez of his *Miranda* rights.  *Id.*; Jan. 20 Hr'g at 10:36; Hernandez Gov't Ex. 2A at 1.  After being advised of his rights, Defendant Gonzalez Hernandez agreed to speak with the agents in the car without a lawyer present.  Hernandez Gov't Ex. 2A at 2; Dkt. No. 95 at 4.  He agreed to cooperate with the agents hoping they could help get him out of this predicament because "he wanted to be there for his son's birthday the next day."  Jan. 20 Hr'g at 10:41; Hernandez Gov't Ex. 2A at 3; Hernandez Def. Ex. 14 at 2; Dkt. No. 91 at 7.

Defendant Gonzalez Hernandez informed the agents that a friend he knew as "*hijastro*" ("stepson") had asked him to bring the money to the Buc-ee's in Luling, Texas that day.  Hernandez Gov't Ex. 2A at 2; Dkt. No. 91 at 6–7; Dkt. No. 95 at 4.  "*Hijastro*" was in jail, and Defendant Gonzalez Hernandez claimed to know him through a friend in Mexico known as "*padrino*" ("godfather").  Hernandez Gov't Ex. 1 at 8:20–9:17; Hernandez Gov't Ex. 2A at 3; Hernandez

Def. Ex. 14 at 2; Dkt. No. 91 at 6–7; Dkt. No. 95 at 4–5.  Defendant Gonzalez Hernandez told the agents that if they wanted to know more about "*padrino*," they should have let him answer a phone call so the other person could keep talking.  Hernandez Gov't Ex. 1 at 8:55–9:06; Hernandez Gov't Ex. 2A at 3; Hernandez Def. Ex. 14 at 2–3; Dkt. No. 91 at 7; Dkt. No. 95 at 5.

At that point, Agent Abelar asked Defendant Gonzalez Hernandez for consent to "review" or "check" his phone.[6]  Hernandez Gov't Ex. 1 at 9:20; Hernandez Gov't Ex. 2A at 3; Hernandez Def. Ex. 14 at 3; Jan. 20 Hr'g at 10:45–46; Dkt. No. 91 at 7.  Defendant Gonzalez Hernandez paused for a moment, and Agent Abelar informed him that it was voluntary, but the faster they got the information they needed from him, the faster they would be able to proceed with their investigation.  Hernandez Gov't Ex. 1 at 9:22–37; Hernandez Gov't Ex. 2A at 3; Hernandez Def. Ex. 14 at 3; Dkt. No. 91 at 7.  Defendant Gonzalez Hernandez said yes, that was fine, and Agent Abelar immediately asked him for the passcode to his cellphone.  Hernandez Gov't Ex. 1 at 9:41–44; Hernandez Gov't Ex. 2A at 3; Hernandez Def. Ex. 14 at 3.  Defendant Gonzalez Hernandez provided the pattern passcode for Agent Abelar, who opened the phone and then handed it to Agent Condon, and Agent Condon began scrolling through it.  Jan. 20 Hr'g at 10:48; Dkt. No. 91 at 7–8.  When asked where he picked up the cash, Defendant Gonzalez Hernandez stated that this was the second time he had picked up money from an address that Pelon provided, and the address should be in his phone.  Hernandez Gov't Ex. 2A at 4; Dkt. No. 95 at 5.

The agents did not request written consent from Defendant Gonzalez Hernandez or provide him with a form detailing the terms of his consent.  Hernandez Gov't Exs. 1, 2A; Hernandez Def. Ex. 14; Dkt. No. 105 at 4.  The agents and Defendant Gonzalez Hernandez did not discuss the

---

[6] In Spanish, Agent Abelar asked Defendant Gonzalez Hernandez, "¿Nos das permiso [para] revisar tu teléfono?" Hernandez Gov't Ex. 1 at 9:18.  The Government translated "*revisar*" as "review," and Defendant translated "*revisar*" as "check."  Hernandez Gov't Ex. 2A at 3; Hernandez Def. Ex. 14 at 3.  The Court finds that "review" is the more accurate English translation.

cellphone any further during the interrogation.  Hernandez Gov't Exs. 1, 2A; Dkt. No. 91 at 8.  The time stamps on screenshots and screen recordings from this manual search of Defendant Gonzalez Hernandez's cellphone show that it took place at approximately 8:35 p.m., which is consistent with the time of the interrogation in the Buc-ee's parking lot.  Hernandez Def. Exs. 1–2; Dkt. No. 91 at 8.

According to the Government, agents conducted a "brief examination" of Defendant Gonzalez Hernandez's cellphone at 12:23 a.m. on May 20, 2025.  Dkt. No. 95 at 6; Hernandez Gov't Exs. 3–4.  Likewise, Agent Condon testified that he went through Defendant Gonzalez Hernandez's cellphone later that night in his hotel room, and that he believed that Defendant Gonzalez Hernandez's earlier consent gave him permission to do so.  Jan. 20 Hr'g at 10:56.  Agent Condon further testified that he scrolled through applications on the phone, including photos, contacts, call history, and WhatsApp messages, searching for evidence that he "deemed relevant to the investigation."  *Id.* at 10:56–57.  As he conducted this second manual search, Agent Condon took videos and photos of WhatsApp conversations between Defendant Gonzalez Hernandez and his alleged co-conspirators.  *Id.* at 10:57; *see* Hernandez Def. Exs. 3–11A.  Agent Condon's search lasted approximately an hour and a half.  Jan. 20 Hr'g at 10:59.  Thus, the photos and videos documenting the next search of Defendant Gonzalez Hernandez's cellphone show timestamps on and around 2:00, presumably around 2:00 a.m. later that night.  *Id.* at 11:14; Dkt. No. 91 at 8; Hernandez Def. Exs. 3–11A.

Agent Condon also photographed the banner notification at the top of the WhatsApp chat between Defendant Gonzalez Hernandez and Jose Cerrato, which indicated that "disappearing messages" was enabled, so messages in the chat would disappear after twenty-four hours.

7

Hernandez Def. Ex. 11A; *see also* Jan. 20 Hr'g at 11:21.[7]   Specifically, Jose Cerrato had implemented settings on WhatsApp that caused messages in the chat between himself and Defendant Gonzalez Hernandez to "disappear" after twenty-four hours.  Hernandez Def. Ex. 11A.  Although these messages disappear automatically after twenty-four hours, the banner notification appears at the top of the WhatsApp chat between Defendant Gonzalez Hernandez and Cerrato.  *Id.*



Hernandez Def. Ex. 11A

---

[7] The banner notification at the top of Defendant Gonzalez Hernandez's screen reads: "*+1 (832) 961-5709 usa una duración predeterminada para los mensajes temporales en chats nuevos.  Los mensajes nuevos desaparecerán de este chat después de 24 horas de haber sido enviados, a menos que se use la opción para conservarlos. Toca para establecer duración predeterminada que desees*." ["+1 (832) 961-5709 uses a default timer for disappearing messages in new chats.  New messages will disappear from this chat 24 hours after they're sent, except when kept.  Tap to set your own default timer."].  WhatsApp advertises disappearing messages as "an optional feature you can turn on for more privacy."  *About Disappearing Messages*, WHATSAPP HELP CENTER, https://faq.whatsapp.com/673193694148537 (last visited Apr. 28, 2026).  "Disappearing messages disappear for both senders and recipients, including messages you send to yourself."  *Id.*  The help page advises that disappearing messages may still appear in replies with the quoted message, in the chat if they are kept by a participant in a chat, or in a backup if a user has created a backup in which the disappearing message is included.  *Id.*

Agent Condon turned Defendant Gonzalez Hernandez's cellphone over to Officer Perez on May 20, 2025, and Officer Perez conducted the forensic examination of the cellphone later that afternoon.  Jan. 20 Hr'g at 1:48; Dkt. No. 95 at 6; Hernandez Gov't Ex. 6; Hernandez Def. Ex. 13.[8]  The Cellebrite search yielded previously deleted WhatsApp messages between Defendant Gonzalez Hernandez and his alleged co-conspirators regarding the exchange that was planned for May 13, 2025, which was canceled.  Jan. 20 Hr'g at 1:49; Hernandez Def. Ex. 13.  The banner notification that "disappearing messages" is enabled remains visible at the top of the WhatsApp chat between Defendant Gonzalez Hernandez and Jose Cerrato, and presumably the notification was visible to Defendant Gonzalez Hernandez while he was messaging Jose Cerrato before allowing agents to access his cellphone.  *See* Hernandez Def. Ex. 11A.  Nevertheless, the Government argues that this warrantless forensic search of Defendant Gonzalez Hernandez's cellphone was justified by his consent for agents to review his cellphone the day before.  Jan. 20 Hr'g at 2:06–2:07.  Because Defendant Gonzalez Hernandez had not withdrawn his consent, HSI did not believe that a search warrant was necessary and conducted the Cellebrite search in reliance on Defendant Gonzalez Hernandez's consent.  *Id.* at 2:09.

In the following months, there were several transitions among the HSI personnel handling this case.  In fact, May 19, 2025, the date of the arrest, was Agent Condon's final day at the Laredo, Texas HSI office, and he was transferred shortly after Defendants' arrests.  Apr. 1 Hr'g at 2:41; Dkt. No. 117 at 5.  Agent Condon testified that he finished his reports regarding this case prior to leaving the Laredo field office, and that the agents who took over the investigation and the

---

[8] Defendant Gonzlez Hernandez originally alleged that Officer Rolando Perez conducted a forensic search of Defendant Gonzalez Hernandez's cellphone using a Cellebrite machine on October 21, 2025.  Dkt. No. 91 at 9; Def.'s Ex. 13. However, at the January 20 Motions Hearing, the Government clarified that October 21, 2025, was the day on which a copy of the report was generated, not the date the forensic search took place.  Jan. 20 Hr'g at 11:23–24.

prosecutors assigned to the case would call him periodically with follow-up questions. Apr. 1 Hr'g at 2:42. Agent Condon was unsure precisely when he alerted his successors that they needed to obtain a search warrant for Defendant Silva's phone, but he estimated that it was sometime in June 2025. *Id.* at 2:55. Incidentally, his fellow case agent was also transferred to another field office in June 2025. Dkt. No. 117 at 5. The Government has alerted the Court that from May 2025 through October 2025, Laredo's HSI field office was sparsely staffed, with numerous agents working on temporary assignments throughout the United States in response to the recent surge in immigration enforcement. *Id.*; *see* Apr. 1 Hr'g at 4:49–51.

HSI Special Agent Garrett Tewey took over the case in June 2025 after Agent Condon was reassigned, so he was the affiant on the search warrant for Defendant Silva's cellphone. Apr. 1 Hr'g at 4:52. Agent Tewey testified that due to the increase in immigration enforcement, he was on several one-to-two-week assignments during the time period from August 2025 through October 2025. *Id.* at 4:49–51. He further stated that this influx in temporary assignments impaired his ability to focus on his own caseload in Laredo. *Id.* at 4:51. Thus, although Agent Tewey spoke with Agent Condon on August 25, 2025, and recalled submitting a request for a search warrant to the Assistant U.S. Attorney (AUSA) the next day, he did not realize that he had not received the search warrant until mid-October 2025. *Id.* at 4:52–54. Upon this realization, Agent Tewey resubmitted his application to the AUSA the next day. *Id.* at 4:53. Agent Tewey acknowledged that although this case was a priority for him, there may have been "a lower level of situational awareness" regarding this case because Defendant Silva remained in state custody. *Id.* at 5:42–43. On or about October 17, 2025, a warrant was issued to conduct a forensic examination of Defendant Silva's cellphone, a black Apple iPhone 13. Silva Gov't Ex. 1; Dkt. No. 111 at 2, 4;

Dkt. No. 117 at 2.[9]  Accordingly, Officer Perez initiated a forensic extraction of the iPhone seized from Defendant Silva later that day, and the forensic extraction was completed on October 18, 2025.  Dkt. No. 111 at 4.

### *Discussion*

The instant motions both assert Defendants' Fourth Amendment rights and seek the suppression of evidence obtained from Defendants' cellphones.  The first, Defendant Gonzalez Hernandez's Motion to Suppress, challenges the search of his cellphone.  Namely, the first issue is whether the scope of Defendant Gonzalez Hernandez's verbal consent in the police car was sufficient to justify Agent Condon's second manual search of the Moto phone in his hotel room and the recovery of deleted material in the forensic search of the Moto phone the following day. Dkt. No. 91; Jan. 20 Hr'g at 9:59.  Defendant Gonzalez Hernandez argues that these searches exceeded the scope of his consent and seeks the suppression of evidence discovered during these two later searches of his cellphone.  Dkt. No. 91.

In contrast, Defendant Silva's Motion to Suppress challenges his iPhone's prolonged seizure.  Specifically, the issue raised by the second Motion to Suppress is whether the warrantless seizure of Defendant Silva's iPhone and agents' subsequent delay in obtaining a warrant rendered the prolonged seizure a Fourth Amendment violation.  Defendant Silva argues that it did and seeks the suppression of all evidence obtained from his cellphone.  Dkt. No. 111.

---

[9] The warrant issued was signed by the undersigned Magistrate Judge.  At the April 1 Motions Hearing, the Court addressed this with Defendant Silva.  Apr. 1 Hr'g at 2:06–2:08.  The Court explained that the issues in Defendant Silva's Motion to Suppress are unrelated to the sufficiency or validity of the warrant itself but rather deal with the length of the seizure leading up to the warrant's issuance and execution, so the matter could properly be referred to the undersigned by the district judge.  *Id.*  After this clarification, Defendant Silva indicated that he understood this distinction and felt "comfortable" with the undersigned presiding over the suppression hearing.  *Id.* at 2:10.

I.        The Search of Defendant Alexis Gonzalez Hernandez's Moto Phone

In his Motion to Suppress Evidence, Defendant Gonzalez Hernandez does not contest the validity of the first manual search of his cellphone that took place in the car. *See* Dkt. No. 91 at 10 ("Defendant Gonzalez Hernandez consented to a single limited search to be conducted forthwith."). However, Defendant Gonzalez Hernandez argues that the later examination by Agent Condon in his hotel room and the Cellebrite forensic examination that occurred the following afternoon, unearthing ephemeral messages that had disappeared from the cellphone, exceeded the scope of his consent. *Id.*

The touchstone of the Fourth Amendment is reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). Courts evaluate whether a search is reasonable under the totality of the circumstances:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish*, 441 U.S. 520, 559 (1979). "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 585 U.S. 296, 304 (2018) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 357.

Consent is one such exception to the warrant requirement. *United States v. Staggers*, 961 F.2d 745, 757 (5th Cir. 2020) ("The government does not need a warrant if it receives (i) consent;

(ii) that is voluntarily given; (iii) by someone with actual or apparent authority; and (iv) the search does not exceed the scope of the consent received." (citing *United States v. Freeman*, 482 F.3d 829, 831–32 (5th Cir. 2007)).  "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251.  To rely on the consent exception to the warrant requirement, the Government has the burden to prove, by a preponderance of the evidence, that the suspect voluntarily consented. *United States v. Rounds*, 749 F.3d 326, 338 (5th Cir. 2014) (citing *United States v. Thompkins*, 130 F.3d 117, 121 (5th Cir. 1997)).

The search must also remain within the bounds of a defendant's consent.  *Staggers*, 967 F.2d at 757. "When the Government relies on consent as the basis for a warrantless search, officers 'have no more authority than they have apparently been given by the consent.'" *United States v. Escamilla*, 852 F.3d 474, 484 (5th Cir. 2017) (quoting *United States v. Zavala*, 541 F.3d 562, 576 (5th Cir. 2008)).  However, a defendant's subjective belief that investigators are not seeking incriminating evidence is insufficient to limit the scope of their consent; rather, the defendant has the responsibility to limit their consent when they see fit to do so.  *United States v. Jason*, 203 F. App'x 625, 626 (5th Cir. 2006); *United States v. Rich*, 992 F.2d 502, 507 (5th Cir. 1993); *United States v. Sarli*, 913 F.3d 491, 495 (5th Cir. 1995) ("Where there is ambiguity regarding the scope of a consent, the defendant has the responsibility to affirmatively limit its scope.").  "In determining the reasonableness of the scope of the search, the 'nature and quality of the intrusion' is balanced against 'the importance of the governmental interests alleged to justify the intrusion.'" *Brown v. Wilson Cnty.*, No. SA-97-CA-1473-OG, 1999 WL 33290666, at *9 (W.D. Tex. Mar. 31, 1999) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

13

When there is a Fourth Amendment violation, courts only apply the exclusionary rule if the societal costs of exclusion do not outweigh its deterrent benefits. *Utah v. Strieff*, 579 U.S. 232, 235 (2016); *see also United States v. Leonard*, 167 F.4th 284, 287 (5th Cir. 2026) ("The exclusionary rule is a disfavored judge-made remedy, which should be used only as a 'last resort.'") (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

a.   <u>Manual Cellphone Search in Agent's Hotel Room</u>

To determine whether the search remained within the scope of Defendant Gonzalez Hernandez's consent, the Court must evaluate how a reasonable person would interpret the exchange between Defendant Gonzalez Hernandez and the agents in which he gave them consent to review his cellphone. *See Jimeno*, 500 U.S. at 251. Based on how a reasonable person would understand the exchange between Defendant Gonzalez Hernandez and the agents in the Buc-ee's parking lot, the undersigned finds that the manual search Agent Condon conducted in his hotel room fell within the scope of Defendant Gonzalez Hernandez's consent.

Defendant Gonzalez Hernandez made no attempt to prevent Agent Condon from scrolling through his cellphone in the car, and he even advised Agent Condon that additional information was available on his cellphone, such as the address at which he retrieved the cash and communications with his alleged co-conspirators. Hernandez Gov't Ex. 2A at 3–4. Courts have held that a suspect's failure to object to a search is a strong indicator that the search falls within the suspect's given consent. *See, e.g.*, *United States v. Gallegos-Espinal*, 970 F.3d 586, 588–89 (5th Cir. 2020) (holding that a cellphone search was within the scope of the defendant's consent where he "observed the Cellebrite extraction taking place" and "failed affirmatively to limit the scope of his broad consent"); *Escamilla*, 852 F.3d at 484 (holding that a manual search of the

defendant's cellphone was consensual where the defendant not only failed to object but "actively complied" with the search).

Here, Agent Condon's additional manual search in his hotel room neatly tracked the scope of his search in the car—he combed through recent activity on the Moto phone, looking through contacts, photos, and recent communications.  In doing so, Agent Condon scrolled through communications between Defendant Gonzalez Hernandez and his alleged co-conspirators; he played voice notes sent between them; and he took photos and videos of any such communications that were relevant to his investigation.  Jan. 20 Hr'g at 10:51–53, 10:56–11:14; Hernandez Gov't Ex. 3; Hernandez Def. Exs. 3–11A.  Because Defendant Gonzalez Hernandez "actively complied" with the search of his cellphone in the car, a reasonable person would anticipate that his consent to the first manual search extended to the manual search at the hotel, which was conducted in the same manner and during which Agent Condon reviewed the same kind of material. *See Escamilla*, 852 F.3d at 484.

Moreover, unlike in *Escamilla*, the search here did not have a clear endpoint.  In *Escamilla*, the court held that the initial search of the defendant's cellphone ended when the investigating officer handed the cellphone back to the defendant and indicated that he was finished with it. *Escamilla*, 852 F.3d at 485 ("Just as Escamilla's directly handing Agent Garcia the phone initiated the consensual search, a reasonable person would understand that Agent Garcia's directly handing the phone back to Escamilla ended it.").  In this case, however, there was no clear break between the initial search and the search in the hotel room.  On the contrary, Defendant Gonzalez Hernandez understood that Agent Condon retained his cellphone, and the record does not support a finding that Defendant Gonzalez Hernandez attempted to limit the scope of future manual searches in any way.  A reasonable person would anticipate that the agent might recommence scrolling through the

15

cellphone within mere hours of the initial consent, in the same manner he did while sitting in the car, and document his evidentiary discoveries more thoroughly.

Therefore, it was reasonable for Agent Condon to rely on Defendant Gonzalez Hernandez's earlier consent to justify his extended manual search of the cellphone once he returned to his hotel room later that night. The undersigned **RECOMMENDS** that Defendant Gonzalez Hernandez's Motion to Suppress Evidence be **DENIED** in part regarding Special Agent Condon's manual search of the cellphone in his hotel room.

b. Forensic Cellebrite Search

The Cellebrite search of the cellphone by Officer Perez the following day, which unearthed ephemeral messages that any reasonable person would believe had disappeared, is another matter entirely. The more intrusive a search becomes, the broader the scope of consent must be to encompass it. *Cf. United States v. Berry*, 670 F.2d 583, 597 (5th Cir. 1982) ("The more intrusive on an individual's freedom complying with a request would be, the greater should be the skepticism with which a court treats assertions that an individual consented to a request."). Under the totality of the circumstances, the undersigned finds that a reasonable person would not understand the meager exchange between the agents and Defendant Gonzalez Hernandez to grant consent for an intrusive forensic search of the cellphone, conducted outside the presence of the defendant and extracting messages that any reasonable person would believe had disappeared from the device. Thus, the undersigned finds that the May 20, 2025, warrantless Cellebrite search of Defendant Gonzalez Hernandez's cellphone exceeded the scope of his consent from May 19, 2025, and recommends that evidence gleaned from the Cellebrite search be suppressed from the Government's case-in-chief.

16

As with the manual search, the Court begins its analysis with the exchange in which Defendant Gonzalez Hernandez gave his consent for agents to search his cellphone. While sitting with agents in the car, Defendant Gonzalez Hernandez consented when they asked him to review his cellphone. Gov't Ex. 1 at 9:20; Gov't Ex. 2A at 3; Def. Ex. 14 at 3; Jan. 20 Hr'g at 10:45–46; Dkt. No. 91 at 7. At no time did the agents clarify or otherwise indicate that the search would encompass a complete, thorough, or forensic examination of the cellphone, nor did they provide him with a standard consent form that included the forensic examination of the phone. Hr'g at 1:33; *see Gallegos-Espinal*, 970 F.3d at 588 (holding that a forensic cellphone search was within the scope of the defendant's consent where he "signed a consent form that, in its broad terms, encompasses the search and seizure conducted"). Any of these actions, if taken by the agents, would have undoubtedly broadened the scope of Defendant Gonzalez Hernandez's consent. However, absent such express terms delineating the bounds of his consent, the scope of Defendant Gonzalez Hernandez's consent to search the Moto phone must rest entirely on the brief exchange in the agents' vehicle.

Moreover, Defendant Gonzalez Hernandez had a heightened privacy interest in the messages that had been set to automatically disappear after twenty-four hours, presumably to conceal them from anyone viewing the contents of the WhatsApp chat between Defendant Gonzalez Hernandez and Jose Cerrato. At a minimum, a reasonable person would believe that certain messages had disappeared from the Moto phone, which is strong evidence that Defendant Gonzalez Hernandez did not consent to the recovery and review of those messages. Even in *Gallegos-Espinal*, the Fifth Circuit made a point to note that the evidence discovered in the Cellebrite search was not deleted from the phone and "would have been accessible to an agent conducting a manual search of the iPhone." *Gallegos-Espinal*, 970 F.3d at 590. This rationale

17

also distinguishes the instant case from *Escamilla*. Although the court in *Escamilla* held that the defendant had abandoned his privacy interest in the cellphone by the time a Cellebrite search took place, the evidence recovered was also discoverable through a manual search. *Escamilla*, 852 F.3d at 486. Thus, while *Escamilla* rules that a defendant abandons his possessory interest in a seized cellphone, it does not directly address whether a defendant maintains a privacy interest in deleted messages that were only recovered through a forensic examination of the cellphone. Such is the situation here.

Considering the concision of Defendant Gonzalez Hernandez's exchange with the agents and his heightened privacy interest in the disappeared WhatsApp messages, his consent was simply not broad enough to encapsulate the recovery of disappeared WhatsApp messages through the Cellebrite search. Agents merely asked whether they could review Defendant Hernandez Gonzalez's cellphone. Had they clarified that it would be a "full" or "complete" review, or had Defendant Gonzalez Hernandez signed a broad consent form, his verbal consent to the search may be expected to shoulder the weight of a forensic search extracting disappeared messages from the technological ether. *See Gallegos-Espinal*, 970 F.3d at 592 (holding that a reasonable person would understand that a "'complete' cell phone search refers not just to a physical examination of the phone, but further contemplates an inspection of the phone's 'complete' contents"); *United States v. Batson*, 749 F. App'x 804, 806 (11th Cir. 2018) (holding that a forensic search was within the scope of consent where the defendant signed a standard consent-to-search form); *United States v. Spivey*, 861 F.3d 1207, 1212 (11th Cir. 2017) (affirming the denial of a motion to suppress where the defendant gave written consent "to conduct a full search of the home and a search of his computer and cell phone."); *United States v. Worthy*, 129 F.4th 479, 484 (8th Cir. 2025) (holding that a forensic search was consensual where the defendant signed a form specifically authorizing

18

a forensic extraction of his cellphone); *but see United States v. Lewis*, 81 F.4th 640, 652–53 (6th Cir. 2023) (holding that a seizure and forensic search exceeded the scope of the defendant's consent even though he signed a consent form authorizing a "complete search"). The undersigned finds that Defendant Gonzalez Hernandez's bare bones consent in this case is insufficient to bridge the gap between a brief review of his phone and the forensic recovery of evidence that a reasonable person would believe had disappeared. In sum, the Government asks Defendant Gonzalez Hernandez's verbal consent to review his phone to support more weight than it can bear.

In coming to this conclusion, the Court emphasizes that the scope of a defendant's consent is a case-specific inquiry assessed under the totality of the circumstances. *United States v. Williams*, 836 F. App'x 310, 312 (5th Cir. 2021). Accordingly, the undersigned finds this case distinguishable from *United States v. Thurman*, in which the Seventh Circuit held that a reasonable person would understand their consent to search a cellphone to include the recovery of recently deleted messages. *United States v. Thurman*, 889 F.3d 356, 368 (7th Cir. 2018) ("A reasonable person may be expected to know that recently deleted information can be reconstructed on a cell phone."). In *Thurman*, unlike in this case, agents showed the defendant a consent form, which he refused to sign but verbally assented to. *Id.* at 368. Importantly, Thurman had viewed the same consent form regarding permission to search his residential property and added specific limitations. *Id.* at 361. He did not qualify his consent to search his cellphone with similar limitations, leading the court to conclude that his consent to search his phone was not likewise limited. *Id.* at 368. Moreover, Thurman had specifically admitted to investigating agents that there were "deleted text messages with [his co-defendant] about their transaction earlier that day." *Id.* at 362. In this case, in contrast, Defendant Gonzalez Hernandez was never shown a broad consent form, nor did he indicate that there would be deleted messages regarding his involvement in drug trafficking on the

Moto phone. Hr'g at 1:33. Rather, Agent Condon was alerted to the existence of previously erased messages between Defendant Gonzalez Hernandez and Jose Cerrato during his second manual search of the Moto phone. *See* Hernandez Def. Ex. 11A.

Nor did Defendant Gonzalez Hernandez give implied consent for the forensic recovery of his "disappeared" communications. Thus, this case also differs from *Sarli*, in which the Fifth Circuit "rejected the notion that a consensual search ceases to be valid simply because the accused is unable to observe the conduct of the search." *Sarli*, 913 F.3d at 495. *Sarli* addressed a situation in which "there [was] ambiguity regarding the scope of a consent." *Id.* There is no such ambiguity in this case. In *Sarli*, the defendant was detained in the back of a police cruiser while officers searched his truck pursuant to his consent. *Id.* at 493–94. The search "lasted less than an hour, and the police maintained continuous control over the truck." *Id.* at 496. While this rationale of continued possession validates Agent Condon's search in his hotel room, there is no indication in this case that a forensic search was ever implied or would reasonably be inferred by Defendant Gonzalez Hernandez based on his exchange with agents in the car. Without such an implication, there cannot be implied consent.

In striking contrast, in *Gallegos-Espinal*, the court held that the defendant failed to limit the scope of his consent where investigators conducted a Cellebrite search in his presence, and he failed to object. *Gallegos-Espinal*, 970 F.3d at 589 (reasoning that the defendant "observed the Cellebrite extraction taking place . . . and could see clearly the agents connecting wires from the Cellebrite to the gray Samsung. It is clear that, at that point, he knew more than a 'look through' was occurring, but he still made no objection or comment."); *see also United States v. Flores*, 63 F.3d 1342, 1362 (5th Cir. 1995) (holding that a search was within the scope of the defendant's consent where the defendant "was present during the search and did not attempt to stop or restrict

20

the search at any time."); *United States v. Beckmann*, 786 F.3d 672, 678 (8th Cir. 2015) ("Where a person is present and fails to object to the continuation of a search, courts consider such circumstantial evidence to provide proof that the search conducted was within the scope of consent.").

Not so in this case. Unlike in *Gallegos-Espinal*, Defendant Gonzalez Hernandez's exchange with the officers and their observable conduct during that exchange would not lead a reasonable person to anticipate the recovery of deleted messages from the cellphone. At base level, an objectively reasonable person would not understand consent to "review" a cellphone to include consent to forensically "reconstruct" or "recover" information that had already disappeared from the cellphone. Furthermore, unlike Gallegos, Defendant Gonzalez Hernandez had no reason to infer from agents' actions that consent to review his phone would authorize anything more than a manual search of his cellphone, let alone that it extended to extracting the entirety of its contents. A reasonable person would not expect that allowing law enforcement to review one's phone would grant them consent to unearth messages that had disappeared from a secure messaging platform a week earlier. Defendant Gonzalez Hernandez had no opportunity to consent or object to the Cellebrite search for ephemeral messages in this case.

Under the totality of the circumstances surrounding the exchange between Defendant Gonzalez Hernandez and Agent Abelar, a reasonable person would not anticipate the scope of Defendant Gonzalez Hernandez's consent to include the reconstruction of disappeared messages. The ephemeral nature of the messages unearthed by the Cellebrite, Defendant Gonzalez Hernandez's heightened privacy interest in the disappeared messages, and the lack of any hint from the agents that they intended to conduct a subsequent forensic search of the cellphone to recover deleted materials lead the undersigned to conclude that a reasonable person would not understand

21

consent to review his phone to encompass anything more intrusive than scrolling through recent activity, like Agent Condon did in the car and in his hotel room. Thus, the recovery of disappeared messages through the Cellebrite search was outside the scope of Defendant Gonzalez Hernandez's consent and constituted a violation of his Fourth Amendment rights.

Even where there is a Fourth Amendment violation, courts only apply the exclusionary rule where the "deterrence benefits outweigh its substantial social costs." *Strieff*, 579 U.S. at 237 (quoting *Hudson*, 547 U.S. at 591); *see also Leonard*, 167 F.4th at 287 ("The exclusionary rule is a disfavored judge-made remedy, which should be used only as a 'last resort.'" (quoting *Hudson*, 547 U.S. at 591)). Yet, the undersigned finds that this balancing test supports suppression here. In this case, HSI relied on the thinnest of consents to support the heavy weight of a forensic extraction of material that had otherwise disappeared from plain view. As the Supreme Court held in *Riley*, cellphones are not immune from search, but "a warrant is generally required before such a search." *Riley v. California*, 573 U.S. 373, 401 (2014). When the Government relies on the consent exception to the warrant requirement, the resulting search must not exceed the scope of the consent given to investigating officers. *Escamilla*, 852 F.3d at 484.

In this case, the Government relies heavily on Defendant Gonzalez Hernandez's agreement for agents to review his cellphone and the demonstrative conduct of Agent Condon scrolling through the cellphone in the car. In doing so, the Government partially overlooks the criteria for valid consent—a simple "yes" will not suffice to justify every degree of intrusion in every circumstance. Rather, valid consent must be voluntarily given by somebody with authority to consent to a search, and the resulting search must remain within the scope of the consent given. *Staggers*, 961 F.2d at 757 ("The government does not need a warrant if it receives (i) consent; (ii) that is voluntarily given; (iii) by someone with actual or apparent authority; and (iv) the search

22

does not exceed the scope of the consent received." (citing *Freeman*, 482 F.3d at 831–32).  This recommendation is for a narrow holding—warrantless Cellebrite searches pursuant to a suspect's consent are not per se unreasonable.  *See, e.g.*, *Gallegos-Espinal*, 970 F.3d 586.  However, in defining the scope of consent, the Court remains bound by how a reasonable person would interpret the exchange between the defendant and the agents to whom he consented.  *Jimeno*, 500 U.S. at 251.

Here, where HSI did not have the clear terms of a written consent form, and it was not evident from Defendant Gonzalez Hernandez's exchange with HSI Agents that he consented to a forensic extraction of ephemeral cellphone information, the constitutional path forward was abundantly clear: get a warrant.  Instead of obtaining a valid warrant, HSI hastily bypassed the Supreme Court's caution in *Riley*—delving into Defendant Gonzalez Hernandez's "cache of sensitive personal information" and relying solely on his earlier permission for agents to review his cellphone and his cooperation with Agent Condon as the agent scrolled through the recent activity on the Moto phone.  *Riley*, 573 U.S. at 395–96.  A reasonable person would not expect such meager consent to support such an extensive search.  This is precisely the type of intrusive and unconstitutional conduct the exclusionary rule was meant to deter.  Thus, the deterrent effects of suppression in this case would be strong.

On the other side of the scale, the social costs of suppression would not be unduly high, particularly because agents had permissible means to acquire the desired evidence—they could have subpoenaed WhatsApp or procured a search warrant.  Instead, we are left with a situation where Defendant Gonzalez Hernandez's verbal consent was brief and narrow, and the resulting search unearthed unusually ephemeral evidence entitled to a higher expectation of privacy.  Accordingly, the undersigned **RECOMMENDS** that Defendant Gonzalez Hernandez's Motion to

Suppress, Dkt. No. 91, be **GRANTED** with respect to the Cellebrite search, and that the District Judge suppress the evidence discovered through the forensic search of Defendant Gonzalez Hernandez's cellphone from use in the Government's case-in-chief.

II.      The Seizure of Defendant Gabriel Silva's iPhone

Turning to the other cellphone in this case, Defendant Silva argues that the seizure of his cellphone and its retention for three months while he was in jail on state charges, plus two months after he was indicted in this federal case, before the issuance of a search warrant constituted an unreasonably prolonged warrantless seizure in violation of his Fourth Amendment rights.  Due to his inability to possess his cellphone while he remained in custody, however, the undersigned finds that the governmental interest in maintaining Defendant Silva's cellphone as evidence significantly outweighed his virtually nonexistent possessory interest in the cellphone for the duration of the warrantless seizure.

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)).  In fact, "even a seizure based on probable cause is unconstitutional if police act with unreasonable delay in securing a warrant." *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998); *see also United States v. Lowe*, Criminal Action no. H-10-813-2, 2011 WL 1831593, at *2 (S.D. Tex. May 12, 2011) ("[E]ven when a search warrant is based on probable cause, an unreasonable delay in obtaining a search warrant can render prolonged seizure of a suspect's property unreasonable." (citing *Jacobsen*, 466 U.S. at 124)).

In determining whether a seizure is justified under the Fourth Amendment, courts balance the nature and degree of intrusion on an individual's possessory rights against "the importance of

the governmental interests alleged to justify the intrusion." *Place*, 462 U.S. at 703. Accordingly, the Fifth Circuit has established that the factors a court should consider in determining whether the length of a warrantless seizure is reasonable include "investigatory diligence, the length of the detention, and whether there were circumstances beyond the investigator's control." *United States v. Martinez*, 25 F.4th 303, 308 (5th Cir. 2022); *see also Place*, 462 U.S. at 709 ("[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.").

As an initial matter, the Court finds that agents were entitled to seize Defendant Silva's cellphone both incident to arrest and because they had probable cause to believe that it was an instrumentality of and contained evidence of a crime. *United States v. Robinson*, 414 U.S. 218, 225–26 (1973) (holding that it is reasonable for officers to seize evidence recovered during a search incident to arrest to prevent its destruction); *see also Riley*, 573 U.S. at 388 ("[O]fficers could have seized and secured the[] cell phones to prevent destruction of evidence while seeking a warrant."); *Place*, 462 U.S. at 701 ("Where law enforcement authorities have probable cause to believe that a container hold contraband or evidence of a crime . . . the Court has interpreted the Amendment to permit seizure of the property, pending issuance of a warrant . . . if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present.").

Even a seizure that was lawful at its inception can become unlawful if it is unreasonably prolonged. *Caballes*, 543 U.S. at 407 (citing *Jacobsen*, 466 U.S. at 124). Defendant Silva's cellphone was seized incident to his arrest and held for five months, but Defendant Silva had only been indicted for the final two months, and he was only in federal custody for approximately the last six weeks. Dkt. Nos. 47, 49, 57. Until then, he was held in state custody at the Gonzalez

25

County Jail.  The Court acknowledges that, if considered in isolation, the length of the detention in this case cuts against the Government.  Even if the Court were to consider the time from federal law enforcement taking over to the time of the search, August to October 2025, the two months it took to procure a search warrant would sit at the high end of what courts have found to be a reasonable delay.  *See United States v. Pratt*, 915 F.3d 266, 273 (4th Cir. 2019) ("Given Pratt's undiminished interest, a 31-day delay violates the Fourth Amendment where the government neither proceeds diligently nor presents an overriding reason for the delay."); *United States v. Mitchell*, 565 F.3d 1347, 1353 (11th Cir. 2009) (per curiam) ("Under these circumstances, the twenty-one-day delay was unreasonable."); *United States v. Smith*, 967 F.3d 198, 202 (2d Cir. 2020) (holding that a month-long delay "was unreasonably long in violation of the Fourth Amendment");  *but see Martinez*, 25 F.4th at 305 (affirming the denial of a motion to suppress challenging at seventeen-day delay between the detention of packages and their search); *United States v. Jackson*, 132 F.4th 1019, 1021 (7th Cir. 2025) (Easterbrook, J.) (holding that a forty-day delay was not unreasonable where the defendant had no possessory interest in the seized cellphone).

While *Martinez* addresses the prolonged seizure of a package, the Fifth Circuit has not yet directly ruled on the issue of prolonged seizures of digital devices.  Thus, Defendant Silva leans heavily on *Pratt* and *Mitchell* in arguing that the length of the warrantless seizure of his cellphone was unreasonable.  However, this case is distinguishable from those cases because Defendant Silva was in custody for the duration of the warrantless seizure of his cellphone, so his possessory interest in the cellphone was significantly diminished.  In contrast, both Pratt and Mitchell were not in custody and thus had a strong possessory interest in their digital devices.  *Pratt*, 915 F.3d at 272–73 ("Pratt had an undiminished possessory interest in the cellphone . . . ."); *Mitchell*, 565 F.3d

26

at 1351 (holding that a twenty-one-day delay in obtaining a warrant was unreasonable where "the possessory interest at stake . . . was substantial"); *see also Smith*, 967 F.3d at 208 ("This case is unlike those where courts have found that a defendant has a diminished property interest . . . ."). Thus, Defendant Silva's reliance on *Pratt* and *Mitchell* is misplaced.

Here, Defendant Silva's possessory interest was far from undiminished—he had no possessory interest in the cellphone while he was detained, and he was detained for the duration of the warrantless seizure of his iPhone. In fact, inmates in state or federal custody are not even allowed to have cellphones.[10] Apr. 1 Hr'g at 3:36; TEX. PENAL CODE ANN. § 38.11(a)(3) (West 2025); *Jackson*, 132 F.4th at 1021. The Seventh Circuit confronted a similar situation to this one in *Jackson*, in which Judge Easterbrook found that a defendant has no possessory interest in digital devices that they are not allowed to possess while in custody. *Jackson*, 132 F.4th at 1021 ("Unlike the situation in *Burgard*,[11] *Mitchell*, and *Pratt*, however, Jackson did not have a right to keep the cell phone in his possession during custody. No jail or prison allows inmates to keep and use cell phones."); *see also United States v. Sykes*, 65 F.4th 867, 879 (6th Cir. 2023) ("Sykes had a limited possessory interest in the phone because he was not permitted to have the phone while he was in custody."). Because the defendant in *Jackson* had no possessory interest in the seized cellphone, the court held that the district court properly denied his motion to suppress. *Jackson*, 132 F.4th at 1022.

---

[10] The irony is not lost on the Court that this case originated with communications between Defendants and Jose Cerrato, who was using a cellphone to communicate with them while incarcerated. However, as Agent Condon clarified at the suppression hearing, inmates might illegally acquire cellphones that are smuggled into jails and prisons as contraband. Apr. 1 Hr'g at 3:25–26. Therefore, any possessory interest an inmate would have in a cellphone is not legitimate and not one that society recognizes as reasonable.

[11] 675 F.3d 1029 (7th Cir. Apr. 2, 2012). Defendant Silva does not explicitly rely on *Burgard* in his Motion to Suppress as he does *Mitchell* and *Pratt*. In *Burgard*, the Seventh Circuit held that a six-day delay between the warrantless seizure of the defendant's cellphone and procuring a search warrant was not unreasonable. *Id.* at 1034. Similarly to *Mitchell* and *Pratt*, however, the court in *Burgard* held that the defendant had a "strong interest in possessing his cell phone" when he was not in custody. *Id.*

"In contrast, the government had a significant interest in retaining possession of the phone, as well as an excusable reason for delay." *Sykes*, 65 F.4th at 879. The Government had a heightened interest in retaining the cellphone because they had probable cause to believe it had evidentiary value. *United States v. Thomas*, 97 F.4th 1139, 1144 (8th Cir. 2024) ("In contrast, the government had probable cause to believe the cell phone contained evidence of Thomas's crimes and thus had a strong interest for seizing it."); *Smith*, 967 F.3d at 209 ("The fact that there was probable cause—rather than merely reasonable suspicion—allowed more time for the police to retain possession of the tablet pending their application for a search warrant."). Because Defendant Silva actively used the cellphone to communicate with the undercover agent and his co-conspirators; he was holding the cellphone in his right hand when he was arrested on drug charges; he appeared to be on a call with his alleged co-conspirators; and the cellphone appeared to be recording a face-to-face call at the time of his arrest, which followed a thirty or forty-mile flight and pursuit; the Court finds that the Government had probable cause to seize the phone because agents knew that Defendant Silva has used the phone to facilitate the alleged offense and had probable cause to believe that the cellphone contained evidence of the charged offense. Apr. 1 Hr'g at 2:23–33, 3:31, 3:54–55, 4:01–4:02; Gov't Exs. 4, 5 at 7:20–30. Accordingly, while Defendant Silva had a negligible possessory interest in the phone, the Government had a "strong interest for seizing it." *Thomas*, 97 F.4th at 1144; *see also Place*, 462 U.S. at 701; *United States v. Song*, No. 21-51229, 2023 WL 4906646 (5th Cir. Aug. 1, 2023) (holding that a warrantless seizure was reasonable where the agent had probable cause that evidence of a crime would be on the defendant's cellphone).

Nor did Defendant Silva make any attempt to reclaim his cellphone while it was being held at the TAG unit, likely because he knew that any such attempt would be futile. Apr. 1 Hr'g at 2:39;

28

*see Jackson*, 132 F.4th at 1021 ("Had Jackson sought to regain or transfer the phone's possession—or indicated any concern about delay in searching its contents—that could have spurred the police to seek a warrant quickly. But he did not, so they did not. The time they took was not unreasonably long."); *United States v. Sullivan*, 797 F.3d 623, 634 (9th Cir. 2015) (holding that a twenty-one-day seizure of a laptop before getting a warrant was not unreasonable where the defendant "was in custody the entire time on distinct charges, [did] not argue he made any request for the laptop's return, and had a reduced possessory interest due to his status as a parolee"). Accordingly, not only did Defendant Silva lack a possessory interest in his cellphone during his detention, but he made no effort to assert one.

While the Court agrees with Defendant Silva that investigators did not exercise impeccable diligence in this case, much of the delay can be attributed to factors outside the agents' control. *See Martinez*, 25 F.4th at 308. In *Martinez*, the Fifth Circuit held that a seventeen-day delay between the seizure of packages and obtaining a search warrant was reasonable where the investigating officer was reasonably diligent. *Martinez*, 25 F.4th 303. In so holding, the court reasoned that the investigating agent was "diligent in drafting the applications for the search warrants" despite an eight-day lapse between establishing probable cause and obtaining the warrants because during those eight days, he "was required to work on other cases, he took a sick day, and the delay included a weekend." *Id.* at 308–309.

In this case, Agent Tewey's acquirement of the search warrant was impeded primarily by intervening events including changing circumstances within HSI and an unusually heavy caseload. Here, the investigation changed hands when Agent Condon relocated; in fact, May 19, 2025, was his last day on the job at this assignment. Apr. 1 Hr'g at 2:41. Agent Condon testified that he finished his reports and remained available for his successors to call him with questions. *Id.* at

2:42. The investigation then passed to Agent Tewey, who chronicled a hectic travel itinerary for various assignments throughout Fall 2025, explaining that this series of temporary assignments affected his ability to efficiently manage his own case load. *Id.* at 4:49–51.

At Defendant Silva's suppression hearing, Agent Tewey testified that he initially prepared an application for a search warrant in August 2025, shortly after Defendant Silva was indicted in this case. *Id.* at 4:52. Then, between August and October 2025, Agent Tewey undertook several temporary assignments related to the upsurge in immigration enforcement, including multiple stints with Immigration and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO) and traveling to Dallas, Ohio, Atlanta, McAllen, and Memphis, each for one-to-two-week increments. *Id.* at 4:49–51. He reapplied for the warrant two months after his initial application went unanswered by the U.S. Attorney's Office. *Id.* at 4:53. Any one of these facts standing alone may not be sufficient to justify the five-month delay in obtaining a search warrant for the cellphone, or even the two-month delay between Defendant Silva's indictment and the issuance of a search warrant. However, taken together and considering Defendant Silva's significantly diminished possessory interest, the delay in procuring a search warrant was not unreasonable.

That it was undertaken by a joint state and federal task force further muddied the waters of responsibility for this investigation. Specifically, although he was arrested on May 19, 2025, Defendant Silva was not indicted in this federal case until he was charged by superseding indictment three months later, on August 19, 2025. The undersigned surmises that the superseding indictment prompted federal law enforcement to pick up investigating Defendant Silva's case where state authorities left off, which is likely why Agent Tewey first drafted a search warrant for the iPhone on August 26, 2025. *Id.* at 4:52–53. Defendant Silva was subsequently brought into federal custody by writ of habeas corpus ad prosequendum, Dkt. Nos. 49–50, and he had his initial

appearance in this case on September 9, 2025. Sept. 9 Min. Entry. Defendant Silva has remained in federal custody since that date. *See* Dkt. No. 57 (ordering Defendant Silva's detention pending trial). Significantly, however, Defendant Silva would not have been allowed to possess his cellphone throughout the duration of his time in both state and federal custody.

An unusually demanding caseload can justify a delay between the seizure of evidence and the procurement of a search warrant. *See Sykes*, 65 F.4th at 878 (holding that a month-and-a-half delay was reasonable where "the delay between the seizure and search was not due to indecision or lack of diligence, but instead to the demands of this and other cases"); *contra Pratt*, 915 F.3d at 272–73 (holding that "[g]iven Pratt's undiminished interest," a 31-day delay was unreasonable where "the agents . . . failed to exercise diligence by spending a whole month debating where to get a warrant"); *Smith*, 967 F.3d 198 (holding that a thirty-one-day delay was not justified because the police forwent the "time-sensitive duty to diligently apply for a search warrant . . . to attend to other matters for which the Constitution imposes no such time-sensitive duty . . . ."). Here, like in *Sykes*, due to Defendant Silva's virtually nonexistent possessory interest in the cellphone, the delay in procuring search warrant was justified by the amorphous duties of agents as the investigation changed hands and by Agent Tewey's plethora of travel assignments and demanding case load.

Even if there was an unreasonable delay in procuring a search warrant, the exclusionary rule would not apply. "The exclusionary rule is a disfavored judge-made remedy, which should be used only as a 'last resort.'" *Leonard*, 167 F.4th at 287 (quoting *Hudson*, 547 U.S. at 591). In fact, "the rule's prime purpose is to deter future unlawful police conduct." *United States v. Calandra*, 414 U.S. 338, 347 (1974). The application of the exclusionary rule "has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Id.* at 348. Accordingly, courts only apply the exclusionary rule if the societal costs of exclusion do not

31

outweigh its deterrent benefits. *Strieff*, 579 U.S. at 235. "The substantial social costs exacted by the exclusionary rule for the vindication of Fourth Amendment rights have long been a source of concern." *United States v. Leon*, 468 U.S. 897, 907 (1984). Thus, "an assessment of the flagrancy of the police conduct" is an essential part of the inquiry into whether the exclusionary rule should be applied. *Id.* at 911.

Here, HSI was less than diligent but was not dilatory. Although the investigating agents could certainly have exercised more diligence, the undersigned finds that the delay in procuring the search warrant resulted not from bad faith but from intervening circumstances beyond their control. Personnel changes, a whirlwind of temporary assignments, and a lapse in communication with the U.S. Attorney's Office all contributed to Agent Tewey's delay in obtaining a warrant to search Defendant Silva's iPhone. Where such uncontrollable factors were primarily to blame for the delay between the seizure of the iPhone and its search, suppressing the resulting evidence would have little to no deterrent effect. This minimal effect would not outweigh the "substantial social costs" of preventing the Government from introducing evidence that was procured pursuant to a search warrant and inhibiting the truth-finding function of the Court by suppressing evidence to no deterrent avail. Therefore, even if the delay between the seizure of Defendant Silva's iPhone and the issuance of the search warrant was unreasonable, the evidence discovered on the iPhone would not be subject to suppression.

Due to his negligible possessory interest in the cellphone throughout its warrantless seizure and HSI's efforts to navigate circumstances beyond their control, the undersigned finds that the five-month delay in obtaining a warrant to search Defendant Silva's cellphone did not render the length of its seizure by HSI unreasonable in violation of the Fourth Amendment. Even if the delay was unreasonable, the evidence obtained from Defendant Silva's iPhone would not be subject to

the exclusionary rule. Thus, the undersigned respectfully **RECOMMENDS** that Defendant Silva's Motion to Suppress Evidence obtained from his cellphone, Dkt. No. 111, be **DENIED**.

### *Conclusion*

For the foregoing reasons, the undersigned requests that the District Court **ADOPT** its findings of fact. Further, the undersigned respectfully **RECOMMENDS** that Defendant Gonzalez Hernandez's Motion to Suppress, Dkt. No. 91, be **DENIED IN PART**, regarding the manual search, and **GRANTED IN PART**, regarding the forensic search. Accordingly, the undersigned **RECOMMENDS** that the evidence gleaned from the forensic search of Defendant Gonzalez Hernandez's cellphone, namely, the previously disappeared messages, be suppressed from the Government's case-in-chief. Additionally, the undersigned **RECOMMENDS** that Defendant Silva's Motion to Suppress, Dkt. No. 111, be **DENIED**.

IT IS SO RECOMMENDED

Signed this May 13, 2026, in Laredo, Texas.

Diana Song Quiroga
United States Magistrate Judge

### *Warnings*

The parties may file objections to this Report and Recommendation, unless they waive the right to do so. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider

frivolous, conclusive, or general objections. *Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982) (en banc)).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after being served with a copy of the Report— or the party's waiver of the right to do so—shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations and, except upon grounds of plain error, shall bar the party from appellate review of proposed factual findings and legal conclusions accepted by the District Court to which no objections were filed. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140, 150–53 (1985); *Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).